Good morning. May it please the court, my name is Timothy Presso on behalf of the appellants. I'm joined by my co-counsel Stephen Mishuda. This case concerns the US Fish and Wildlife Service's approval under the Endangered Species Act of the Rock Creek Mine in the midst of occupied habitat, highly imperiled populations of the grizzly bear and bull trout in northwest Montana's grizzly bear issues, and specifically with the issue of the service's calculation of grizzly bear replacement habitat. The service used a discounting approach to determine the amount of replacement habitat necessary to compensate for the mine's grizzly bear habitat impacts, but it did not apply its discounting approach even-handedly. When it came to determining the compensation necessary for the mine's impact, the service looked at existing developments within the mine's impact zone and discounted the mine's compensation obligation accordingly, and that's how the service got from finding a 7,044 acre impact to a 2,350 acre mitigation requirement. But when the service turned to the mitigation lands, it abandoned its discounting approach, and instead it assumed that every acre of the mitigation lands could fully satisfy the 2,350 acre mitigation requirement, even though the majority of those lands, like some of the lands to be impacted by the mine, are burdened by existing developments that would not be removed if the lands were purchased to mitigate the mine's impacts. So at bottom, when the service looked at an acre with a road on it within the mine's impact zone, it found that that equaled less than an acre of replacement habitat, but when the service looked at an acre with a road on it on the mitigation parcels, the service found that that acre equaled an acre of replacement habitat. That's fundamentally arbitrary, and that undermines the service's no-jeopardy conclusion for grizzly bears in this case. Um, counsel, may I ask you, what is our standard of review for reviewing the district court's finding that it was not arbitrary? It's de novo, your honor. It's de novo because we're proceeding on an administrative record, and it's well established in this court's jurisprudence that these kinds of administrative procedure act standard review is de novo when it comes to the court of appeals. Thank you. Now, the problem is even worse than I've described because it is impossible to put together the 2,350 acre mitigation package without dipping into that pool of developed lands. One of the look, we had a different way of looking at this. We had a prioritization scheme, and we down-prioritized those lands that were developed, but the problem is there aren't enough undeveloped lands to assemble this mitigation package. You have to dip in to some extent to the pool of developed lands to get the job done. But if that happens, then the project doesn't go forward at all, right? No, your honor, that's a different... If the mining company can't get the landowners to sell, then they can't begin to operate the mine. That's correct, your honor, but that's a point that goes to our second grizzly bear issue, which is the timing of the habitat acquisition. The mining company and the service can fulfill the entire 2,350 acre obligation with lands that are burdened by development and still go forward with the mine. There's no requirement that they halt the mine until they come up with undeveloped mitigation lands. And indeed, as I've described, they have to dip in to the development. But counsel, they can't operate the mine, isn't that the... They can build the mine, but they can't operate the mine if they don't have the necessary amount of mitigation. That's correct. There's two issues that we're focusing on with respect to the grizzly bear. The first is, did they rationally calculate the amount of habitat required? There's no contingency about operation of the mine with respect to that piece of it. The second issue we're raising is they put off acquisition of a quarter of the mitigation lands until the mine is fully constructed. And as to that, you're correct, your honor, that there is a contingency that says they cannot operate the fully constructed mine if they don't come up with the lands, and I'll address that in a moment. I just want to make sure the court's clear on those. There's two separate pieces, and that contingency doesn't apply to the first point I'm addressing. All right. Okay. And I want to point out, these impacts of these developments are profound. The service says, well, we prioritized those lands that have some features that are important to grizzly bears. And that's all well and good, but the problem is, how do those features help the bears if they're not using the lands? Within the impact zone, the service said, if we have a road that receives low use, that reduces the grizzly bear use by 70%. Many of the lands within the mitigation parcels have roads that are at even higher use. So that means that the amount of grizzly bear use is decreased by even more than 70%. So whatever features those lands may have that are so important to grizzly bears, if the bears' use of them is reduced by 70% or more, how does that offset the mine's impact? With respect, I guess what I struggle with is the fact that people can do whatever they want with statistics. And environmental cases show that perhaps more than almost any other legal point except maybe antitrust. But in this particular case, the Fish and Wildlife Service concluded that, I'm going to quote here, it would in fact mean the plan would in fact improve conditions over the long term or the existing conditions, ultimately promoting the recovery of the cabinet yak ecosystem grizzly bear population. So they're saying that not only would this maintain them, it would actually improve the situation. They cite all kinds of measures they've taken collectively that instead of reducing the grizzly bear situation would improve it. You, of course, take an entirely opposite position. Here we have a government agency that has lots of experts. You all have lots of experts. Is it your position that under de novo review, as you've described it, that we owe no deference at all to the Fish and Wildlife Service? No, of course not, your honor. But at the same time, the court certainly completes arbitrary decision making. I get that. But I'm just saying, I mean, you look at this record, and this is not the first go around on this one, of course, and there's an incredible amount of work and rework and attempts to work with you all and attempts to work with everybody to try to get this resolved. You folks, on the other hand, have a very different perspective. I is, if you have two diametrically positioned points of view about the same data, what difference do we owe to the Fish and Wildlife Service in our analysis of the data? We're not scientists. You have to rely on experts on this. So do we owe any deference to the Fish and Wildlife people? Of course. And if this were a case where you had our expert view versus their expert view, you would be right. But the problem is that what the service is talking about, and when it talks about improvements and whatnot, is primarily focusing on the population trajectory, which is right now a downward spiral to extinction, and they're saying... That's why they're going to bring in six more females. That's exactly right, your honor, and that's because they expect there'll be one grizzly bear mortality due to this mine. So there's this mortality impact, and the court is right as to that. They've got to essentially prop the population back up sufficiently so it's not in a downward spiral so that they can add another mortality to it. But their projection is that if there were no mine at all, the mortality would continue. You're expecting the mine. That's correct, your honor, but wholly apart from the mortality issue, there's this habitat impact issue. I understand, but what I wrestle with in this kind of situation is I want to follow the law I want to do what the courts have indicated, what the Supreme Court has indicated, what the legislature has indicated, and in this situation, if there were no mines at all, the projection is that this population here would just disappear. They're now taking steps, or project to take steps, that would actually revivify the grizzly bear community by bringing in the six females and so on, and they think it would vastly improve what the current situation is. What's the problem with that? Well, your honor, it would improve it to the extent that the population could sustain the mortality they expect from this project. But that's one bear, right? That's one bear, and the reason they said six is because they hope that one of those will stick, thereby offsetting the loss. But I guess the point is, your honor, just because they have this augmentation program, that doesn't mean they get a clean or a free pass on the habitat program. In fact, they themselves have said the habitat program is so important that if they don't come up with a habitat, they can't operate the mine. That doesn't sound like an expendable mitigation measure. The bottom line is the habitat mitigation matters and defects in the habitat mitigation matter, and that's why we're talking about the fact that they've come up with a program where their alleged replacement won't be a replacement at all because the bears are going to end up with a net loss. Well, we're dealing with an agency here that I cannot say is not sympathetic to preserving wildlife. I understand your honor's point, but at the same time, this court's jurisprudence is full of situations in which the Fish and Wildlife Service has failed to meet its Endangered Species Act, and we're dealing with three successive instances in the case of this project where the service failed to meet its obligations under the act. So I would submit that the mere fact that it's the Fish and Wildlife Service doesn't mean that we can assume that there's anything necessarily absolutely correct about what they did here. Help me with this one. I'm just trying to understand this intellectually. Has Rock Creek Alliance ever, in any case, ever agreed with the Fish and Wildlife Service as to the ultimate outcome of litigation that they have filed? Your honor, I'm not sure that Rock Creek Alliance has ever been involved in litigation that didn't involve this mine, but certainly the fact that there have been two biological opinions that have been overturned due to Rock Creek Alliance's advocacy, I think, indicates that the Alliance did not agree with the service and its analysis of this mine. Okay. But I don't think, with due respect, the question for the court isn't, you know, does Rock Creek Alliance generally agree with the service? My point is just simply that I find it difficult to believe that you would ever agree with them on anything, and I respect that. I don't quarrel with your right to do that, but it gets back to this point that I mentioned before, is if we have a very respectable and respected organization, such as the one you represent, that is opposed to any development, particularly a mining development, under any circumstances, and you've got the federal agency that, on the other hand, is supposed to comply with the law to process all these kinds of things, it gets back to me, again, to the issue of if we have the respected organization that you represent and these other folks, and you've got diametrically opposed positions, here we are, appellate judges, not doctors, not scientists, we have to make a law as we understand it. And that's where the issue of deference really plays a huge role, in my view. Well, Your Honor, with due respect, I don't think it's enough for the court to say these parties disagree and we defer to the agency without getting into the mechanics of this thing and sort of examining the machinery and figuring out did they do the job? I agree with that. We have done that. I know all of us on this panel have done that. We have read your materials, dug into it. I've got pages and pages and pages and pages of detailed notes. But the bottom line is I don't see anything you'd agree upon. Anything. Well, we're challenging their decision, so we certainly don't agree with their decision. I will say that if they came up with a plan that said we'll apply even-handedly our method for calculating replacement habitat and we'll make sure that the habitat is acquired before we go about inflicting impacts on this population, we would agree with them. That would be an interesting day. Well, I would like to see that day come. But what we have right now is a situation where the bears end up with the short end of the stick on the amount of habitat and the bears get driven out of the habitat before the mitigation is acquired. And on that point, let me just stress. In terms of analyzing the mortality of the grizzly bears, is the principal problem human contact? I'm sorry. I didn't understand that. I'm sorry. Oh, wait. I might have you. No, I could hear you, Your Honor. I just didn't understand exactly what you said. All right. What I was asking is what is the principal cause of mortality for the What is the principal cause? It's lethal interactions with humans bearing guns primarily. How does that relate to the critical habitat issue? Your Honor, there has been no critical habitat designated for the grizzly bear population. The critical habitat issue goes to the bull trout impacts, which I'd like to address. All right. That's separate. All right. So your concern is that there's not sufficient undeveloped land in the mitigation parcels to avoid the human contact with the humans with guns. Well, and not sufficient undeveloped land within the mitigation parcels to equal the quantum of replacement habitat that they say is required. It's not us coming up with a number and saying they needed this number. That would be the kind of situation that Your Honor posits, where we have our expert number, they have their expert number. We're taking their approach, their own method and saying, wait a minute, you applied it on one side of the equation. You didn't apply it on the other side of the equation. How is that not arbitrary and capricious to the detriment of the bears? All right. Your Honor, briefly, as to the timing of the acquisition, nearly a quarter of the total of the habitat will not be acquired until the mine is fully constructed. And the impact to the bears in terms of displacement and fragmentation of their habitat has already occurred. This court in National Wildlife Federation v. National Marine Fishery Service says you can't rely on future mitigations unless there's a guarantee they will occur. Here, there can be no guarantee because the acquisition depends on the actions of third-party sellers. And this case is not like the Southwest Center case that the defendants rely on because here there are only specific limited combinations of parcels that will suffice. I thought they've already purchased 273 acres of mitigation land. That's correct, Your Honor, but obviously that's well short of 2,350. Counselor, that raises another question that I've had. All of the briefs are filed under seal, but the district court opinion was not. And I don't know that we actually sealed off these confidential and under seal at this point. Your Honor, the sensitive piece of information, which was the cause of the sealing, was the locations of the mitigation parcels, so as not to basically create a situation where somebody could extort an excessive price. And obviously, I'm sensitive not to discuss those things, and the district court did, and so I think we're okay on that. All right. If I can turn briefly to the bull trout issues. The service acknowledged that this mine will dump more sediment into a stream that has been designated critical habitat for bull trout, which is already degraded by sediment, and that that impact will last for five to seven years, which is very near the entire life cycle of an individual bull trout. But the service said it doesn't really matter because the Rock Creek habitat is too small to matter in the scale of critical habitat for the species. I thought what they said was that 2.88 miles of the critical habitat is already functioning at a low level and is marginally suited to support migratory bull trout before any of this happens. That's true, Your Honor, if we're only looking at migratory bull trout. But there's 1,900 resident fish, and so the service has never said we could write off those resident fish as being unimportant. But I guess this kind of goes to the overall point, though. They also say that the 2.88 miles of the Rock Creek represent only 2% of the 135 miles of stream critical habitat in the lower Clark Fork Core area and 0.1% of the stream critical habitat in the Columbia River Basin. In other words, this is kind of a tiny, tiny little portion of it. The health of the species itself is not endangered when you consider the critical habitat overall. Did you disagree with that? I think that's exactly what they said. And that's the problem is what they did was they said, this is spawning habitat. It's okay to lose it because we've got all this other habitat, much of which is useful for entirely different purposes, foraging, overwintering, migrating. They never said, what other spawning habitat do we have? And do we have enough of that if we lose the Rock Creek population? If that 2.88 acres, let's just say hypothetically that it not only is it low quality, but it just doesn't work anymore. Regardless of anything it's done, it's just totally, you don't get any spawning there at all. What impact, if any, would that have on our deliberations? If that were the case? If that were the case. Well, I think given that the issue with critical habitat includes recovery, the question would really be, do we need that area to recover the species? Not just, is it not important for survival? So you're saying that not only can they not consider the current status of it in terms of the analysis of critical habitat and the viability of the species there, but that they would actually have an obligation to revivify the area, reconstruct the area in some way so that there would be a resumption of spawning in that area? No, Your Honor, I don't think that's what we're saying. I see my time's expired. If I can address your point. Please answer the question. Yeah, I think the point would be, and the point is, that the mine doesn't have any obligation to go out there and, as the court puts it, revivify the habitat. But when the mine starts dumping sediment into the stream, it does have an obligation to ensure that that critical habitat is not adversely modified or destroyed, and adverse modification, as this court has said, includes impacts to recovery. So the question is, did the service look at impacts to recovery in the right scale? And our point is, you've got to have spawning habitat for this species to survive. You can't determine you've got enough spawning habitat by saying, we've got this big chunk of habitat that's useful for all kinds of purposes, not just spawning, and never address the question, do we have enough spawning habitat if we get rid of this? And as to the court's point about this being degraded, it is degraded. It's a curious thing for the service, in examining a habitat category that's supposed to be useful for recovery, to focus on the currently degraded nature of it and say, that's a reason to write it off, when what they're trying to do is get the species back to the point where it can get off the list. So I mean, it's a sort of a counterintuitive approach. I see that my time's expired. I had intended to reserve a short amount of time for rebuttal, but perhaps the court will indulge me with a minute or two. Very well. Thank you. May it please the court. My name is Robert Oakley. I'm here from the Department of Justice on behalf of the Fish and Wildlife Service. I'm splitting my time. I'm going to take 15 minutes. Mr. Tuchman, who represents the Intervenor Rivet Mining Company, will take the other five. Let me go first to the grizzly bear question that Mr. Press has started. I'm sorry, you split time? I'm sorry, Your Honor? I'm sorry, you split this time? Yes. And I understand it's my obligation to look at the clock and let the court know when we're at 15, so I don't cut into Mr. Tuchman's time. Your Honor, let me go to the question of grizzly bears first. And before I get to the two, the methodologies used in the land, I'd like to go to a question Judge Wardlow raised about, which Mr. Presso accurately answered, that the problem, the harm to the bears, the mortality rate, were people with guns. And that's not protected simply by getting undeveloped parcels. But one thing Rivet's doing that's going to happen only because Rivet's building this mine, or hopes to build this mine, is that it's going to fund, for example, for these three Montana officers to engage in working with people to educate them how to avoid bears, because there's no question that human-bear contact always ends, eventually, badly for the bears. There are other measures like Rivet's going to provide for bear-proof garbage cans. Now, that doesn't sound sexy. It's not like an iPad. I can't make my kids happy by giving them bear-proof garbage cans like I could with an iPad. But it's actually very important, because once bears get used to getting to human food, they're not going to go work for it anywhere else, and you're going to have that kind of human contact. So those are types of measures that Rivet's funding that will go to help reduce mortality. And if you look, I think it's in my supplemental excerpts of Record of the Scholar. There's an article in there, pages four and five. And also at the beginning of the biological opinion, there is a discussion year-by-year on mortality. I think it's page 714. A big population drop was caused by this simple interaction of people with bears, and so that's what we're trying to address here. So we are trying to make things a plus for the impacts. Let me ask you another question. How do you respond to the Rock Creek Alliance's argument that the grizzly bear mitigation is inadequate because it doesn't account for the portions of the mine's impact zone that are already developed? I'm glad you brought that question up, Judge Wardlow, because first, they can't operate the mine until they get the final 566 acres. But they have to get everything but another 500. At that point, they can only construct the mine. They cannot even construct the mine if they're missing the final 1,032 acres. And the reason those acres are picked out by number is that if you go through the calculations, and they're somewhat complicated, but we try to discuss them in the brief, there is an assessment of acreage which is made simply because there's going to be increased traffic over the highways that exist. And that increased traffic which will be generated by the construction and then by the So in other words, they're going to have to half-mitigate their increased traffic before they can construct the mine, and they're going to have to completely mitigate it. Why not have them get the land now? I'm sorry? Why not require them to obtain the land now? Why wait until mines are constructed? Well, we're not waiting until the mine is constructed. They can't construct the mine until they have almost all of it, and then they can't operate it. I think, something the district court judge pointed out, said in one of its filings, it's very, very expensive to construct this mine. And they're not going to do that and then say, oh gosh, we couldn't get the last 566 acres, well, let's go look somewhere else. They have every incentive to get that land. Bottom line, they can't operate. None of the environmental concerns expressed would occur until all the land has been acquired. Is that correct? That is correct. They cannot operate, and they have to have a great deal of this, and there are other parts of this plan that have to be in place, not just the acreage, and it's important not to lose sight of that. For example, six bears have to augment the population before they can start construction. And even before they start construction, there's something called an adit that they have to do, an evaluation adit, which they have not done yet, which will generate information that relates to which is not before the board, that is on remand to the agencies addressing NEPA issues and National Forest Management Act issues. So they've got a lot of things to do. This is at a very early stage now in terms of development. And there are all sorts of mitigation measures that have to be accomplished before they get to the point of even constructing the mine. Why wouldn't it be better for the mining company to acquire the land now? You know, nothing's been built. They haven't put their money into it. The economy is down. I would pass that to Mr. Tuckman, although in fairness, I don't know that he knows the answer either. He's the attorney for the mining company. I don't know what the cost of the land will be to revet versus the cost. Certainly they've already made, they've already acquired 277 acres. And those acres, by the way, are very critical acres. Those acres are designed to further connectivity between the Cabinet Mountains section and then the Yaak River drainage to the north. And that's very important because if you get the populations isolated, then they're at even more risk. There's going to be inbreeding. Isn't that the portion that we're not supposed to be discussing, which is actually where the lands are that they have to acquire? That much, I think, can be said. It is said in the district court's decision and it's said in the biological opinion, which is public. What we can't talk about is there is a document, a couple of documents on the record, which identify very specific pieces of land by acreage and something that someone could look at and say, oh, well, I can figure out where that is. Well, would someone please identify those documents for us so we don't inadvertently put them into an opinion or a NAMDISPO? Your Honor, if I could do that by way of a 28-J letter. That would be helpful. Okay, with the panel. Now, as to the two methodologies here, we're doing two different things. First, by the way, the actual number of acreage that Revett's going to have to acquire is 2450, not 2350. So in coming up with that number, the Forest Service, I'm sorry, the Forest Service working with Fish and Wildlife wanted to figure out how much damage would Revett affect the habitat for the grizzly bear. And much of the habitat was already being affected. There were roads, there was development, et cetera. So where Revett was going to totally take land, it would have to replace all of it. For example, there's going to be a tailings pile. There's going to be a footprint, I think, of about 483 or so acres. They've got to replace that on a one-to-one basis. On the other hand, to take it to the other extreme, there are existing roads, and this is the part I've told you that would be acquired towards the end, or the numbers at least reflect the land that would be acquired towards the end, where there's simply going to be increased traffic, where the bears are already subject to displacement. Now, in making this calculation, in other words, it was sort of a cause and effect thing. What additional load to the system is Revett going to add? But what we didn't do is we didn't look at the habitat and say, well, you know, this land that Revett's going to affect, it's really pretty terrible land, and the grizzlies don't use it anyhow, so let's not make them replace that at all. No, we didn't engage in such a consideration. But when we look at parcels that we rank in priority that Revett has to acquire, that's exactly what we look for. We look to see what's the most valuable land that we could acquire for the grizzlies, and we prioritize them. And Revett can only buy land below the top priority if they can show us that there's just absolutely no way that they can acquire the top priority. And there were four factors, and in that calculation, by the way, we also did take into consideration whether there's been development. Because if there's been development, if there's extensive development, then that's going to knock it down in priority. And in some cases, though, acquiring the land, you might be able to close a road. And if you're going to be able to close a road, you're going to actually make that habitat now a net plus. It's not simply 100 acres. It's 100 acres plus because that road's closed, there's no traffic, and the displacement. So it's better than it was before. So that's why we say in the biological opinion, the actual impact at the end could well be greater than acquiring 24, 50 acres. Now, these acquisitions have to be approved by a committee on which Fish and Wildlife is a member, the Forest Service is a member, the state participates. It's all public. If we don't do this, if we don't acquire this, the mine can't go forward. And this makes it a very different case than the other cases cited by Mr. Presa, where the action was ongoing at the same time and the mitigation was in the future. Here, it's reversed. The action has to occur only after the mitigation is a done deal. If the mitigation is not a done deal, the action can't happen. Well, but you'll be building and constructing new habits and all the rest of it. Well, it's a step-by-step process. The adits are a relatively small exploration thing. But again, they can't operate until they have all the land, and they can't construct until they have all but 566 acres. Is it that they don't want to buy the land, but they construct the adits, so they have a pretty good idea of what's there, what it's worth? The adit needs to be constructed to generate information both for their benefit, but also for the Forest Service's benefit in terms of how this facility would be permitted. There may implicate a lot of issues beyond this case, like the Clean Water Act. But I would just say, it's an early stage. Additional NEPA work is going on in this site. They might do the adit and decide this is not a good area to mine. Well, if they do, and they walk away, and they don't fund the mitigation plan, there's no mine, which in some ways would be viewed as a success by the plaintiffs in this case. I think it's a loss to the grizzly bear, because as I think several of the panel have pointed out, the projections for this bear is not good on the long term, unless we do a lot of things. And the point here is, ReVet is going to be doing things outside the impact area of the mine itself. So this is not just zeroing out the mine. This is making things better in the general area for the bear. If I could turn briefly to the... Why doesn't the government fire this man? Well, right now, Your Honor, I may be out of a job on August 2nd, because as I understand, if they don't raise the debt ceiling, they can either pay the credit... They're talking about paying creditors and paying Social Security, but not paying anybody else. And by the way, Your Honor, I think that includes you and the other members of the bench. It does. I've got several homeless elders already lined up. So I... I'll save a bed for you. You know, I think it would be great. I think it'd be great. Got one in Washington, D.C., too. Oh. Yeah, at the old soldier's home. I think I want you to have a look forward to it. Yes, Your Honor. Right near Lincoln's summer home. But it would be nice if they could, but I just don't see a lot of money coming out of Congress. In any event, just on the bull trout, it's only 2.88 acres. And there's a suspicion that it's supposed to be really good for spawning, but in the biological opinion, it says... 3, that of the 5 segments that make up the 2.88 miles, 4 of them are subject to seasonal dewatering. So there's no real connection here. In other words, it gets... As Your Honor knows, it gets dry in Montana during the summer. And this part of the Rock Creek area, this 2.88 miles, can lack any connectivity here. Most of the fish actually live upstream, as we pointed out in the brief, on the east fork of the Rock Creek River, upstream from the mine. They're not going to be affected. But in any event, if you compare this to the Butte environmental case, there, 5.62% of critical habitat was being destroyed. Not diminished, destroyed, gone forever. Here, it's 2.88 miles, that for a period of seven years, is going to have additional sediment loadings above that, which it has. And then it'll either return to normal, or it'll be better than normal, because of Revett's mitigation. So if the... Well, how does it return to normal? I'm sorry, Your Honor? How does it return to normal? Well, the sediment loading is caused by the construction of the mine, which is estimated to take five years. And then an additional two years is added onto that, because there would still be some from the ongoing impacts of the construction. But once the mine is operating, there are mitigation measures, and it shouldn't be increasing the sediment load. So it should go back to normal. In any event, this is all measured at what's called the core level, which is 134 stream miles, which is about 2%. So again, if you compare this case to the Butte environmental counsel case, where you had destruction of critical habitat, higher percentage, as opposed to impairment for a period of seven years, it seems clearly that Fish and Wildlife Service's decision was not arbitrary and capricious on either the bull trout or the grizzly bear, and it should be affirmed. And I'll turn it over to Mr. Tuckman. Good morning, Your Honors. Robert Tuckman with the law firm of Home Roberts in Owen, Denver, Colorado, on behalf of Revett Silver Company. I thought I'd perhaps begin, Judge Pragerson, by responding to one of the questions you asked about, why don't they just get the 566 acres now? Well, I can tell you that Revett is a proactive company, and they do want to do the right thing here, and it will not surprise me if Revett does get the 566 acres long before mine operations are set to begin. What the argument is here is that the mitigation plan is saying at this point, the 566 acres must be acquired before operations begin, but nothing precludes Revett from getting it in advance of that time. The plaintiffs are simply saying that it's arbitrary and capricious for the mitigation plan to allow Revett to get that land later, but that doesn't mean that Revett is necessarily going to wait that time and get it later, and as I say, the odds are it's going to get it much sooner. And when we're dealing with this arbitrary and capricious standard, I would refer the court to the Southwest Center for Biological Diversity case. We're dealing here with deference to the agency as to the sufficiency of the mitigation plan that Fish and Wildlife has developed for protection of the grizzly bears, and in Southwest Center for Biological Diversity, this court stated we must defer to the special expertise of Fish and Wildlife Service in drafting, and they say RPAs, which is reasonable and prudent alternatives, which is a fancy word for mitigation, that will sufficiently protect endangered species. So this is a situation where this court time and again has said that unless the record plainly that the agency has made a clear error in judgment, absent that, deference is owed by this court to the agency's determinations, and in particular, when we're dealing with a question of what level of mitigation is adequate to protect the listed species. I thought it might also be useful to go to one of the points that Mr. Presso raised, which is this question about, well, do we look at bear mortality issues different from bear displacement issues, and I would submit we don't, and the Fish and Wildlife Service didn't do that either, and here's the reason why. Ultimately, what we're dealing with here is a question of protecting the grizzly bear, jeopardy, recovery, survival, it all comes down to bear population. Well, what are the factors that impact bear population? Well, it's, as we pointed out, bear mortality, it's augmentation of bears, and it's bear pregnancies. All of those factors affect the population of the bears, and what's happened here is that Fish and Wildlife Service has developed a plan which addresses each of these things, and is saying, collectively, when we look at all the measures that Revett must take to protect these grizzly bears, we hereby find that no jeopardy is going to occur, and in fact, we're going to actually up the ante here,  this case, the one we're dealing with here, is on all fours with the Selkirk case decided by the Ninth Circuit. In Selkirk, Judge Tallman said, hey, this is what's going on here. The Fish and Wildlife Service has identified the most troublesome problems. The Fish and Wildlife Service has recognized the magnitude of the problems, and it has developed mitigation measures to address those issues. The issue before the court in Selkirk was, hey, do we have a mitigation plan here that is sufficient to protect the bears? The court concluded, yes, we do, and that is exactly what's going on here. Revett has to implement a multitude of mitigation measures to protect these bears, to reduce mortality risk, to monitor bears, to hire two biologists, to hire a law enforcement officer, and in its wisdom, what Fish and Wildlife has determined is that collectively, when you look at all of these measures, this bear population is going to be better off. There is going to be no jeopardy. These bears are going to be okay. You've already won the bear vote. It's good to know that, Your Honor. I've just got to, this whole issue of deference to the agency, if we just turn to bull trout, it's the same concept. They ought to, they ought to. Yeah, but even turning to the bull trout, it's the same concept. It's the very same concept. The ultimate challenge on the bull trout is, there's a challenge to the methodology that Fish and Wildlife Service followed in determining no adverse modification to bull trout. That's what's going on here, and just like with the grizzly bears, we're dealing with decisions by the federal agency implicating a high level of technical expertise, implicating predictive judgment, implicating scientific issues, and that is precisely the kind of matter that this court has held repeatedly, deference should be given to the agency. And there is nothing in the record that would show that there is a clear error of judgment here, nothing whatsoever. And so I would respectfully submit, just like with the grizzly bear, as to the bull trout, this court should respectfully defer to the decision making of the agency with respect to the protection of that species and its critical habitat as well. How many cases are there involving fish and wildlife where there's been a gamble on the future that before activities are going to take place, well, that construction goes ahead, but the mining can't take place until other acreage is acquired? I don't know how many cases there are, but I can perhaps answer your question this way, and that is if we look at this 566 acres that is the subject of the challenge by the Rock Creek Alliance, no harm and no jeopardy to the grizzly bear is going to occur if in fact those 566 acres are not timely acquired. And there are reasons for that. One reason is, okay, the plaintiffs point out in their brief and they say, well, there's going to be construction impacts from constructing the mine. But that's not an issue because the 566 acres were never intended to mitigate for the construction impacts of the mine. If the 566 acres are acquired in a timely way as soon as mine construction ends, well, the impacts from mine construction are going to happen anyway. So then you go to the next category of potential impacts that Rock Creek Alliance identifies, and they say, well, okay, what happens if you build these mine facilities, they all get constructed and you can't get the 566 acres, you're going to have these mine facilities that potentially are going to cause a problem. And we would submit, well, first off, there's no way that those 566 acres are not going to be acquired. And as I pointed out, the odds are Rivette's going to acquire them well in advance. But because of all of the mitigation measures that Rivette must implement before the mine can ever start construction. And so all of these measures are going to be implemented with certainty. I mean, before a spade of dirt is lifted, Rivette has to hire the two biologists, hire the law enforcement officer, deal with the garbage pails, the garbage receptacles, acquire the 1884 acres of land. There is so much that is going to have to be done in advance, that even if that contingency that the plaintiffs are concerned about were to occur, where the final 566 acres are not acquired, and these facilities are built but non-operating, there is so much mitigation in effect in advance that there is not going to be harm to the bear at all. And then you get into your last theory, which is, okay, fine. Well, you don't get the 566 acres. There's the damage that would occur if you started operating the mine. Well, that's not going to happen because Rivette has no authority or ability to operate the mine without the final 566 acres. So it's a non-problem. And you never even have to get to the question of reasonable certainty because these bears are not going to be harmed if Rivette, in fact, cannot acquire the final 566 acres. Yes, well, thank you very much. I appreciate it. I want to begin with a question that Judge Smith asked the government counsel. Judge Smith, you asked, well, if the final mitigation acquisition does not occur and the mine cannot be operated, then none of the environmental concerns will arise. And government counsel said that's correct. But in fact, it's not correct because the construction phase alone is expected to drive the bears out of 7,000 acres of habitat. And that construction phase occurs before the final installment on the mitigation package. And that's at page 806 of the excerpts of record, this point that the displacement impact is supposed to come at the outset. And government counsel also says, well, it's about the addit, which is a small-scale operation. The addit is not the only thing that can go forward before that final installment is due. The entire construction of the mine can go forward. And that's not a small-scale operation. Now, the mining company lawyer says, well, the final 566 acres is not supposed to mitigate for that construction phase. That's not correct. They expect the full 7,000 acres of displacement to occur at the outset. And that's because it's a very narrow valley. You start doing massive industrial operations in the floor of this valley, you drive bears out of the whole place. They allowed them to purchase the mitigation and installments. But there's nothing about that installment process that's keyed to specific impacts occurring at specific times. The bears take the full hit up front. Judge Pregerson, you asked, how many cases are there where this has been allowed? The answer is there's only the Southwest Center case from this court. I think the task for the court is to figure out how does Southwest Center align with Sierra Club v. Marsh, which came out a different way, and National Wildlife Federation v. National Marine Fisheries Service, which also came out a different way. In the National Wildlife Federation case, this court said you can't rely on uncertain future improvements without a guarantee they will occur. In Sierra Club v. Marsh, this court said you can't destroy habitat unless you ensure the acquisition of the mitigation lands. Their answer to that is to say, hey, we can't operate the mine if we don't acquire the mitigation lands. The problem with that is that may establish that they've got a very powerful incentive to go get those lands, but it takes two to tango. You've got to have a willing seller, and they've got no guarantee there'll be a willing seller. In fact, the evidence in the record is that the majority of these lands are owned by persons who have active development plans for them, so there's an indication these lands may not be available when the time comes. Last, this is not like Southwest Center for a key reason. Southwest Center did not depend on acquisition of only... If the mines are in operation, would that have an adverse effect on the value of the adjacent land? I'm sorry, could you repeat that, Your Honor? If the mines are in operation, let's assume, would that have an adverse effect on the value of the adjacent land? I don't believe that's an issue, Your Honor, no. I don't believe so. But I think what it does have an adverse effect on is the value of the currently occupied habitat to continue to sustain two of the last few remaining female grizzly bears in this region. But I did want to say as to Southwest Center, which the district court also relied on, a key distinction that I hope this court will bear in mind when it looks at that case, this is a case where the service itself says only limited specific parcels will get the job done to mitigate the impacts of this mine. It's not just any land from this pool. It's only certain parcels that will suffice. And yet, we don't know whether those parcels can be acquired until after the bears have already been driven over the ridge by the construction of the mine. Now they say, hey, we may get this land up front. We may not wait. Well, that's all well and good. But then again, they may not. And as this court said in Sierra Club v. Marsh, the burden of uncertainty has to be borne by the project, not by the species. Last. If the land were acquired in advance, would that satisfy your clients? It would certainly satisfy us on that portion of it. Of course, as I said the first time I was addressing the court, there's still the issue of is it enough acreage? And we don't think it is for the reasons I've outlined. But then in terms of the issue of timing, yes, that would take care of our objection. Perhaps much to Judge Smith's delight, we would not object to on that point. Finally, the Butte Environmental Council case the government relies on. The Butte Environmental Council case did not change what this court has said about this critical habitat analysis, which is if you look at impacts on such a vast scale that you mask site-specific impacts, you haven't done your job under the Endangered Species Act. And our point here is they looked at spawning habitat against the backdrop of all habitat, not spawning habitat against the backdrop of spawning habitat. That means you could lose all spawning habitat for the entire population and be in a situation where you've said that none of it mattered because it was all small scale. But that's the approach they used here. You're right. Thank you, Your Honor. I appreciate the court's time. And we ask that you reverse the decision below. Thank you. And this matter will stand submitted. And for the record...
judges: Pregerson, Wardlaw, M Smith, Cjj